UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 21-mj-426 (BRT)

| | | |
|---|---|---|
| STATE OF MINNESOTA | ) | |
| | ) ss. | AFFIDAVIT OF CORY J. SHELTON |
| COUNTY OF RAMSEY | ) | |

I, Cory J. Shelton, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     Your Affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, United States Department of Justice, (hereinafter "ATF"), and is a United States investigative or law enforcement officer within the meaning of Title 18 United States Code Section 2510(7). I have been employed as an ATF Special Agent since March 2014. I am currently assigned to the St. Paul Field Division where I investigate various firearms violations of Federal law, including Title 18 and Title 26. I am authorized to conduct criminal investigations, make arrests, and obtain search warrants. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the Special Agent Basic Training at the ATF National Academy.

2.     This Affidavit is submitted in support of criminal complaint charging Sarah Jean ELWOOD (YOB 1987), Jeffrey Paul JACKSON (YOB 1990), and Geryiell Lamont WALKER (YOB 1999) for making False Statements in connection with Purchase of Firearms, in violation of 18 U.S.C. §§ 2, 922(a)(6), and 924(a)(2), more commonly known as straw purchasing of firearms.

Page 1 of 16

3.     Your Affiant has conducted numerous straw purchase and firearms trafficking investigations. Along with conducting investigations as the primary investigator, Your Affiant has assisted numerous federal and state investigators in conducting firearms trafficking investigations and straw purchase investigations.

4.     The facts and information set forth in this Affidavit are based on Your Affiant's personal observations, training and experience, and information obtained from other law enforcement officers involved in the investigation. To the extent that any information in this Affidavit is not within Your Affiant's personal knowledge, it has been made available to Your Affiant through law enforcement sources that are believed to be reliable and credible. This Affidavit is made for the sole purpose of demonstrating probable cause for the issuance of the criminal Complaint and does not purport to set forth all Your Affiant's knowledge of, or investigation into, this matter.

## PROBABLE CAUSE

### *Relevant Legal Framework*

1.     The ATF is designated by law with regulatory power of the firearms industry. As part of that regulatory scheme, the ATF issues licenses to businesses and individuals authorizing them to sell firearms for profit. Pursuant to 18 U.S.C. § 923, only a Federal Firearms Licensee ("FFL") is permitted to sell firearms as a business.  Pursuant to 18 U.S.C. § 922(a)(1)(A), it is unlawful for a person who is not an FFL (i.e., an ATF licensed dealer), to engage in the business of dealing in firearms.

2.     ATF Form 4473 (Firearms Transaction Record) requires a firearm purchaser to truthfully provide several pieces of information in order to lawfully buy a firearm from

an FFL. Among them, the purchaser must provide their true name and address. Additionally, at question 21(a) on Form 4473, the question states "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s)...?" The purchaser must sign their name to certify that they are the "actual" buyer of the firearm(s) listed on the Form. Form 4473 contains a warning that reads: "You are not the actual transferee/buyer if you are acquiring the firearms(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you."

3.      Pursuant to 18 U.S.C. § 922(a)(6), it is unlawful for any person "in connection with the acquisition or attempted acquisition of any firearm or ammunition" from an FFL or other legitimate firearms dealer to knowingly make "any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive" the firearm seller "with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition[.]" In other words, it is a federal felony crime to lie about a material fact made on Form 4473.

4.      If a purchaser is buying a firearm for another person, but falsely certifies on Form 4473 that he or she is purchasing the firearm for himself or herself, the practice is commonly referred to as "straw purchasing." Straw purchasing usually involves a buyer who can lawfully purchase firearms (i.e., is not legally prohibited and can pass the required background check), purchasing one or more firearms at an FFL, and then providing and/or selling the purchased firearm(s) to another person (usually for a profit) who usually is legally prohibited from purchasing firearms. By completing the straw purchase and delivering the firearm(s) to the prohibited person, the "straw" buyer unlawfully aids the

"actual" buyer or recipient of the firearm to avoid a background check and to therefore unlawfully possess the firearm(s).

5.      ATF conducts electronic traces of firearms, via the firearm's serial number, determining the time elapsed from the date the firearm was purchased at an FFL to the date the firearm was recovered by law enforcement related to a crime.  The shorter the time-to-recovery, usually the more indicative that the particular firearm was straw purchased, especially if the firearm was not reported stolen.

### *ELWOOD's Firearm Purchases*

6.      In May 2021, the ATF learned that at least 3 firearms ELWOOD had purchased had been recovered by police during crime investigations shortly after she bought them. The ATF then began investigating ELWOOD's firearms purchases. Law enforcement subsequently discovered that ELWOOD had purchased at least 56 firearms between August 1, 2020 and May 28, 2021; *approximately 47 firearms were purchased in the month of May 2021 alone*. As of May 28, 2021, at least three of the firearms ELWOOD purchased had already been recovered by police during criminal investigations.

7.      Through speaking with FFL managers and employees where ELWOOD's purchases occurred, reviewing some of the ATF Form 4473s ELWOOD filled out in connection with those purchases and other ATF documents, ATF confirmed that ELWOOD purchased the following 56 firearms during the above-described nine-month period (the number in parentheses following the description of the firearm represents the quantity that she purchased):

    a.  Beretta Nanos 9mm (2)

b.  FN Five-Seven caliber 5.7 (1)

c.  FNH Model 503 9mm (1)

d.  Girsan 9mm (1)

e.  Glock Model 17, 9mm (5)

f.  Glock Model 19, 9mm (9)

g.  Glock Model 22, .357 Sig (1)

h.  Glock Model 22, .40 Caliber (3)

i.  Glock Model 23, .40 Caliber (2)

j.  Glock Model 26, 9mm (4)

k.  Glock Model 27, .40 Caliber (1)

l.  Glock Model 43, 9mm (2)

m. Glock Model 44, .22 caliber (4)

n.  Glock Model 48, 9mm (1)

o.  Heckler and Koch Model VP9, 9mm (1)

p.  HS Produkt Model Hellcat, 9mm (1)

q.  Pioneer Arms Model AK47 Hellpup, 7.62x39mm caliber  (1)

r.  Ruger, Model EC9S, 9mm (2)

s.  Ruger, Ruger -57, 5.7 caliber (3)

t.  Ruger Model Security-9, 9mm (1)

u.  SCCY, Model CPX-2, 9mm (2)

v.  Smith and Wesson, Model Bodyguard, .380 Caliber (2)

w. Smith and Wesson, Model M&P Shield, 9mm (1)

x.  Taurus Model G3, 9mm (1)

y.  Taurus Model Spectrum, .380 Caliber (2)

z.  Girsan Model Regard, 9mm (1)

aa. HS Produkt (Springfield Armory) Model XD9, 9mm (1)

8.      ELWOOD purchased each of the above-described firearms from various FFLs in the State of Minnesota.  Your Affiant has verified the majority of the serial numbers for the above-listed firearms through various forms but has not yet received the original purchase forms necessarily to validate all of them. The investigation is ongoing.

9.      ATF special agents have been able to obtain and review Forms 4473 that ELWOOD signed in connection with 22 of her firearm purchases (receipt of the Forms 4473 for the remaining purchases is pending). On each Form 4473 reviewed, ELWOOD certified that she was the actual purchaser of the firearm(s).   Based on the investigation, this certification was false because ELWOOD was purchasing the firearm(s) for, and at the direction of, another person(s) with no intention of keeping the firearm(s).

10.     For example, a GLOCK Model 19, 9mm pistol that ELWOOD purchased on May 12, 2021, was recovered only 15 days later on May 27, 2021, in possession of a suspect whom investigators had probable cause to believe was involved in a shooting incident occurring on May 11, 2021.  Your Affiant had an NCIC check run on the firearm and determined that no law enforcement record exists indicating that the firearm had been reported stolen.

11.     As part of the investigation, Your Affiant learned that on or about May 9, 2021, ELWOOD purchased four Glock firearms from REALM Firearms LLC, an FFL in

Spring Lake Park, Minnesota. Realm Firearms stated ELWOOD arrived in a blue Chevy Impala, with Minnesota license plate CHX596.

12.    A records check in Minnesota's Driver Vehicle Services system shows that license plate CHX596 lists as a gray Chevy Impala that is registered to Sarah Jean ELWOOD at 57xx Elmhurst Avenue, Crystal MN 55428.

13.    As part of the investigation, Your Affiant learned that on May 21, 2021, ELWOOD traveled to Bills Gun Shop and Range, an FFL in Robbinsdale, Minnesota, and surveillance video showed her arriving in what appeared to be a dark-colored Chevy Impala.

14.    On May 29, 2021, ELWOOD called Bill's Guns Shop and Range (hereinafter "Bill's"), an FFL in Circle Pines, Anoka County, Minnesota, and asked if Bill's had any Glock pistols for sale. The FFL employee responded that they did not, but a short time later ELWOOD arrived at the store and attempted to purchase 2 other firearms. Bill's delayed the purchase and stated that the background check system was not working.    Bill's then contacted the ATF.

15.    On May 30, 2021, Your Affiant was advised that ELWOOD called Bill's on the morning May 30, 2021, to see if the transaction had been approved and the firearms could be picked up. Bill's staff informed ELWOOD that she could pick up the firearms. ATF then established surveillance at Bill's.  At approximately 2:45 p.m., Agents observed a dark-colored Chevy Impala, matching the description of the vehicle previously used by ELWOOD during prior purchases at FFLs, occupied by four adults and a minor child, arrive at Bill's parking lot. The two backseat passengers exited the Impala and walked

inside the store. A short time later, the same two individuals exited the store, returned to the Impala, and the vehicle departed. The Impala drove a short distance away but then immediately returned to the Bill's parking lot. Upon returning to Bill's, the front seat passenger, identified as ELWOOD, exited the vehicle and entered Bill's. The vehicle then departed again while ELWOOD was inside the store.

16. Approximately 15 minutes later, ELWOOD exited the store. She was detained by law enforcement, who found the following in her possession: three newly purchased firearms in boxes, consisting of two 9mm pistols and an AR-15 with a seven inch barrel; three boxes of .223-caliber ammunition; and a 100-round AR-15 high-capacity magazine. Agents obtained a screenshot from Bill's computer system showing the total ELWOOD spent on the purchase transaction was $1,769.50. ELWOOD was in possession of the receipt when Agents made contact with her. The receipt is in the custody of the ATF.

17. While law enforcement was detaining ELWOOD, the Impala returned to the area but made a quick right turn away from Bill's in an apparent attempt to flee the area after occupants observed ELWOOD being detained by police. Police stopped the vehicle and detained the three adult occupants therein. The Impala was the same above-described vehicle that is registered to ELWOOD and was present or described in at least two other known firearms transactions conducted by ELWOOD at other FFLs.

18. The driver of the Impala was identified as Jeffrey Paul JACKSON (YOB 1990), who stated the vehicle belonged to his fiancé, ELWOOD. The two other adult individuals in the Impala - who had entered the FFL earlier after exiting the vehicle - were identified as Geryiell Lamont WALKER (YOB 1999), and S.D.A. (YOB 2000), who

initially identified himself to police under a false name. WALKER had approximately $620 cash on his person, and S.D.A. had approximately $775 cash on his person. Investigators determined that S.D.A. had several active felony warrants. The minor in the vehicle was identified as JACKSON's 6-year-old daughter.

19. Investigators impounded the Impala and towed it to a secured law enforcement lot pending a search warrant to search it related to this investigation.

*ELWOOD's post-Miranda recorded interview*

20. During a post-Miranda recorded interview, ELWOOD stated that the Impala belonged to her. She stated that she and JACKSON are basically homeless and living out of her vehicle most of the time. Recently they have been staying in a Bloomington, Minnesota, hotel room near the Mall of America. ELWOOD stated that the room is rented by JACKSON's mother, but they have a key and stay there when JACKSON has his daughter with him, usually on weekends.

21. ELWOOD admitted that she had been regularly purchasing firearms for about one to two months (on an almost daily basis) because she has a permit to do so and had been regularly selling them to others, including WALKER, whom she knew as "Man-Man," for a profit—usually about $100 per firearm. She said that some of the buyers would give her and JACKSON money up front.

22. ELWOOD stated that she has known WALKER for about two months. She stated that JACKSON coordinated all the meets and sales of the firearms through WALKER. She stated that JACKSON could not obtain his permit to purchase, so ELWOOD made the purchases, and JACKSON set up the deals. She stated she and

JACKSON needed the money because she had lost her job in March 2020, lost her apartment, and her mother had been diagnosed with cancer. ELWOOD stated that she kept almost all of the receipts for the firearms that she has purchased and that they were located inside a gray and pink backpack, that belongs to her and is located in the Bloomington hotel room. ELWOOD stated that JACKSON's brother is also staying at the hotel room, and she gave consent for police to go to the hotel room and search it for the backpack and other items.

23. ELWOOD stated that WALKER was her primary gun customer, having purchased approximately 40 to 45 firearms from her and JACKSON. WALKER would always pay cash for the firearms. WALKER told ELWOOD that he was providing the firearms to other people, but she did not know who. ELWOOD said that WALKER would often order specific firearms.

24. Normally, ELWOOD would make the purchases and either put the firearms in the trunk or hold onto them immediately after the purchase. WALKER would then direct her and JACKSON where to drive and on the drive over, WALKER would pay for the firearms. ELWOOD and JACKSON would usually drop off WALKER at the same intersection at which they would pick him up (Walsh and Maryland in St. Paul, Minnesota).

25. ELWOOD admitted that she also went to DK Mags, an FFL in New Brighton on May 29, 2021, and purchased a Glock handgun and ammunition. JACKSON then sold this gun to WALKER.

26. ELWOOD explained the plan for the afternoon was to make the purchase at Bill's and drive to North Minneapolis, per WALKER's instructions, and WALKER and

S.D.A. would buy the firearms from them once they got to North Minneapolis. WALKER was going to purchase the Ruger for $500, and S.D.A. was going to purchase the other two firearms for $1,000. When they arrived at Bill's, WALKER and S.D.A went in the store first. ELWOOD claimed she was not sure why WALKER and S.D.A. didn't want to purchase the firearms themselves.

*JACKSON's post-Miranda recorded interview*

27.    During a post-Miranda recorded interview, JACKSON stated that he was unemployed and had been so for several months. He stated that he lives out of his vehicle or sometimes stays with his mother at a hotel in Bloomington. He stated that he and ELWOOD started selling firearms for profit because they were both homeless and needed the money. He claimed they make about $100 profit for each firearm regardless of what type of firearm they sell and that they were selling the firearms to try to make money. He admitted that he, ELWOOD, WALKER, and S.D.A. traveled to Bill's in Circle Pines to purchase firearms. JACKSON claimed that he and ELWOOD were going to keep two of the firearms that ELWOOD purchased today and were going to sell the other one. He stated that he has sold about four to five guns to S.D.A. He claimed all four of them were going to go to the shooting range later that night. JACKSON stated he and ELWOOD have purchased and sold approximately 15 firearms. He also claimed that he and ELWOOD would have everyone that purchased a firearm from them fill out paperwork and that ELWOOD kept the paperwork at her parents' house. He also claimed that they only sell to people that they trust and not to people that are going to go shoot up people, or felons, or anyone with a criminal background, but he admitted that he had sold firearms to known

gang members. JACKSON agreed that he and ELWOOD do not keep the firearms they purchase for any significant length of time.

### *WALKER's post-Miranda recorded interview*

28.    During a recorded post-Miranda interview, WALKER admitted that he was dealing with ELWOOD and JACKSON to purchase firearms. WALKER claimed that he was purchasing firearms from ELWOOD because he did not have an identification that would be needed to purchase firearms. WALKER stated that the firearms that he purchased from ELWOOD were then provided to a customer who had ordered the firearms from WALKER. WALKER stated that his primary customer would call him and order firearms and that in exchange for the firearms the customer would provide WALKER with a discount on "exotic" marijuana. WALKER admitted that he is a regular daily user of marijuana and admitted that he was a "junkie."

29.    WALKER stated that after his customer would contact him to order firearms, WALKER would meet his customer in Saint Paul and receive the cash to use for the purchase. WALKER would then contact JACKSON and ELWOOD to arrange the purchase of firearms. WALKER explained that JACKSON and ELWOOD would pick him up in Saint Paul, and they would then travel together to a gun store in the Minneapolis and Saint Paul area to purchase the ordered firearms. WALKER would provide ELWOOD with the cash and tell ELWOOD what to purchase. ELWOOD would then enter the gun store and purchase the firearms. WALKER admitted that he would often enter the gun store first and identify the firearms he wanted purchased prior to ELWOOD entering and

purchasing the firearms. Once ELWOOD had purchased the firearms, she would exit the gun store and then meet with WALKER to complete the sale of the firearms to him.

30. WALKER initially estimated that he had conducted these firearms purchases in conjunction with JACKSON and ELWOOD about 7 to 15 times, but then conceded that he did not have an accurate count because they had conducted these arranged purchases on so many different occasions.

31. WALKER admitted that he had entered the gun stores during some of these arranged purchase transactions while under the influence of marijuana.

32. For the most recent arranged purchase transaction in Anoka, WALKER stated that on May 29, 2021, ELWOOD was going to purchase an AR-15 pistol and a Ruger handgun. WALKER planned to buy the Ruger handgun from ELWOOD and then provide it to a customer (different from the customer described above) who he knew was a felon, and therefore prohibited from legally purchasing and possessing firearms. WALKER explained, however, that when ELWOOD went to purchase the firearms on May 29, the gun store clerk told ELWOOD that the background check system was down and that the store could not complete the transaction, so he and ELWOOD left the store.

33. WALKER stated that the next day, May 30, 2021, ELWOOD called him and told him that a gun store representative called and told ELWOOD that the background check had processed, and that ELWOOD could now purchase the firearms. WALKER arranged to meet with JACKSON and ELWOOD to complete the purchase and sale transaction of the firearm.

34.     WALKER admitted that he and S.D.A. were picked up in Saint Paul by JACKSON and ELWOOD in a black Chevy Impala, and they all drove to the gun store. When they arrived, he and S.D.A. went into the gun store and handled several firearms, including several semiautomatic rifles. They also looked at extended handgun magazines, including a 100-round high-capacity semiautomatic rifle drum magazine. WALKER and S.D.A. then left the store and got back into the Impala. WALKER stated that they pulled out of the gun store parking lot and drove down the street to make it appear less suspicious. They did a U-turn and returned to the store, and ELWOOD exited the vehicle and entered the store to make the firearms purchase while he, JACKSON, and S.D.A. left the parking lot to purchase some food. When they returned to the gun store several minutes later, they saw that police had detained ELWOOD in the parking lot. They turned from the scene in order to leave, but as they were traveling away from the gun store they were pulled over by police and arrested.

35.     WALKER also stated that a loaded Glock handgun under the passenger seat of the vehicle belonged to him and that he had brought the firearm with him. He stated that it was a firearm that ELWOOD had purchased for him previously. WALKER stated that the juvenile 6-year-old in the vehicle with them had gotten possession of the firearm while they were driving and that ELWOOD took the firearm away from the child.

36.     WALKER stated that he was going to purchase the Ruger firearm (for his customer) and that S.D.A. was going to purchase the AR-15 pistol and the 100-round high-capacity drum magazine. WALKER claimed that he did not know for whom ELWOOD had purchased the third firearm (a Taurus).

37.     WALKER initially stated that he was purchasing the firearms for people to protect themselves, but then admitted that he knew the firearms were being utilized for criminal acts and that he "did not care" what they were being used for.

*Knowledge, Training, and Experience Regarding Straw Purchasing*

38.     Based on Your Affiant's training and experience, Your Affiant knows that straw purchasers often purchase numerous firearms at one time from an FFL, or one firearm at a time at multiple FFLs, i.e., multiple one-firearm transactions completed in a short period of time.

39.     Based on Your Affiant's training and experience, straw purchasers often purchase firearms and sell them very shortly after purchase, selling to individuals both known and unknown to them and almost always without conducting a background check.

40.     Based on Your Affiant's training and experience, it is not common for individuals to purchase multiple firearms of the same make, model and caliber in a short period of time unless they intended to straw purchase them and/or sell/traffic them to others.

41.     Based on Your Affiant's training and experience, the firearms ELWOOD purchased are not considered collector firearms.  Additionally, it is not common for individuals to purchase more than one firearm at a time unless they are bona fide collectors. Further, a majority of crime guns that are recovered in connection with crimes are the 9mm caliber. For example, of the nearly 350,000 crime guns recovered in 2019, more than 111,000 (or 31.81%) were 9mm.  38 out of the 56 (68%) firearms ELWOOD purchased as described above are 9mm caliber.

## CONCLUSION

42.    Based on the information set forth above, Your Affiant has probable cause to believe that on or about May 30, 2021, Sarah Jean ELWOOD, Jeffrey Paul JACKSON, and Geryiell Lamont WALKER, aiding and abetting and being aided and abetted by one another, made False Statements in connection with Purchase of Firearms, in violation of 18 U.S.C. §§ 922(a)(6) and 2, more commonly known as straw purchasing.

Further Your Affiant sayeth not.

Respectfully submitted,

Cory J. Shelton
Special Agent, ATF

SUBSCRIBED and SWORN to before me,
by reliable electronic means (FaceTime and email),
pursuant to Fed. R. Crim. P. 41(d)(3), this
_____ day of June 2021,

BECKY R. THORSON
UNITED STATES MAGISTRATE JUDGE